SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
THEODORE C. MAX
tmax@sheppardmullin.com
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone:   212.653.8700
Facsimile:   212.653.8701
*Attorneys for Plaintiffs Bigben Interactive S.A.,
Nacon S.A. and Cyanide S.A.*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BIGBEN INTERACTIVE S.A., NACON S.A., and CYANIDE S.A.S., <br><br> Plaintiffs, <br><br> - against - <br><br> ERIC GOLDBERG and GREG COSTIKYAN, <br><br> Defendants. | Civil Action No. 1:21-cv-08698-DLC <br><br> Amended Complaint and Jury Demand |

Plaintiffs Bigben Interactive S.A. ("Bigben"), Nacon S.A. ("Nacon"), and Cyanide, S.A. ("Cyanide") (collectively, "Plaintiffs"), by their undersigned counsel, Sheppard, Mullin, Richter & Hampton LLP, for their Amended Complaint against defendants Eric Goldberg ("Goldberg") and Eric Costikyan ("Costikyan") (collectively, "Defendants"), allege as follows:

**SUBSTANCE OF THE ACTION**

1. Bigben and its successor-in-interest, Nacon S.A., are French Société Anonyme, and Bigben's subsidiary, Cyanide, is a Société par Actions Simplifier. Cyanide is a video game developer and Bigben and Nacon are video game publishers and distributors. On or about September 6, 2016, Cyanide entered into a license agreement with Defendants ("the License Agreement"), who are game designers, for the development and commercial launch of the

*Paranoia: Happiness is Mandatory* role-playing game (the "Game") for use on personal computers ("PC") and/or a console video game platform. Cyanide entered into an agreement with Bigben for the publishing and distribution of the Game

2. After initially submitting a digital game for approval that purportedly had bugs which interfered with game play, Plaintiffs Bigben and Cyanide delivered to Defendants for approval a digital game, which Defendants' agent and hand-picked quality assurance evaluator approved and two other quality assurance evaluators concluded was without major bugs that would prevent its commercial release and ready for launch to consumers. However, despite that fact, and inspite the express terms of the License Agreement, Defendants withheld their approval or rejection of the Game nor did they request any further modifications of the Game. Instead, Defendants proposed a Third Amendment and tried to extract additional monies that were not provided for in the License Agreement. Plaintiffs Cyanide and Bigben refused to accede to these improper demands and, relying upon the approvals of Defendants' agent and its handpicked quality assurance evaluator, and the fact that Defendants requested no further modifications to the Game, Plaintiffs Cyanide and Bigben launched the Game and requested Defendants' cooperation and collaboration regarding the marketing and advertising of the Game. Contrary to their obligations under the License Agreement and, notwithstanding having received notice of the launch of the Game, Defendants neglected to provide any support and subsequently erroneously claimed that the License Agreement had expired. Defendants' counsel subsequently claimed that the License Agreement had terminated. Notwithstanding this fact, Defendants did not serve a Notice of Termination and never requested any further modification of the Game. In an effort to further harm Plaintiffs and the distribution of the Game, Defendants issued a DCMA

takedown notice on January 21, 2020, which was inaccurate and misleading and has damaged and harmed Plaintiffs and their licensees.

**PARTIES**

3.   Plaintiff Cyanide S.A.S. is a Société Par Actions Simplifiee organized and existing under the laws of France with its principal place of business at 3 Boulevard des Bouvets, 92000 Nanterre, France. Cyanide is a video game developer.

4.   Bigben is a French Société Anonyme organized and existing under the laws of France with its principal place of business at 396-466 Rue de La Voyette, CRT2-59273, Fretin, France.  Bigben is a video game publisher and distributor and Cyanide is its subsidiary.

5.   Nacon is a French Société Anonyme organized and existing under the laws of France with its principal place of business at 396-466 Rue de La Voyette, CRT2-59273, Fretin, France.  Nacon is a video game publisher and distributor and Bigben is its subsidiary.

6.   Upon information and belief, Defendant Eric Goldberg is an individual residing at 1225 Park Avenue, New York, New York 10128.

7.   Upon information and belief, Defendant Greg Costikyan is an individual residing at 355 South End Avenue, New York, New York.

**JURISDICTION AND VENUE**

8.   This Court has jurisdiction over the subject matter of this action pursuant to Section 1367(a) of the Judicial Code, 28 U.S.C. § 1332, because the Plaintiffs are citizens of France and Defendants are citizens of New York State and the amount in controversy exceeds $75,000.  The Court has supplemental jurisdiction over the state law claims under Section 1367(a) of the Judicial Code, 28 U.S.C. § 1367(a).

9. Venue is proper in this district pursuant to Sections 1391(b) and (c) of the Judicial Code, 28 U.S.C. § 1391(b) and (c), because Defendants are subject to personal jurisdiction in this district due to their voluntary transacting business herein and because the License Agreement provides that "[j]urisdiction for litigation of any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach thereof, shall be only in the federal or the state court with competent jurisdiction located in New York City."

10. This Court has personal jurisdiction over Defendants under Section 301 and/or 302 of the New York Civil Practice Law and Rules because they reside and continuously and systematically conducted, transacted, and solicited business in this district, because they have provided services in and to this district.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

11. On or about September 6, 2016, Cyanide and Defendants entered into the License Agreement with Defendants, the original creators of the tabletop role-playing game Paranoia, in order to develop a digital version of the game for use on PC and/or a console video game platform. The License Agreement was further amended by way of Amendment No. 1, dated September 26, 2017 and Amendment No. 2, dated July 25, 2019. These agreements will be referred to herein collectively, as the "License Agreement."

12. Section 3.1 of the License Agreement grants to Cyanide a license to do the following during the Term:

> (a) Use, modify and prepare derivative works of the Licensed Properties to develop and maintain the Digital Game for one or more Licensed Platforms;
>
> (b) Distribute, license and sell the Digital Game (as approved by Licensor pursuant to Section 8 incorporating the Licensed Properties to end users in the Territory, provided that the distribution, licensing and sale is conducted through the Publisher pursuant to the publishing agreement approved by Licensor or, as

          applicable, substantially in accordance with the self-Publishing Plans (the rights in this clause (b), the "Commercialization License"); and

    (c)    Develop marketing materials, advertisements, web pages, downloadable content ("DLC") and other collateral based on the Digital Game, and distribute and display such materials in the Territory for purposes of advertising and marketing the Digital Game.

    13.    Section 8 of the License Agreement prescribes a six-week period for approval of the Game and requires that Defendants "either (a) approve the Developer Materials or (b) reject the Developer Materials and request modifications." To the extent that the Defendants wish to "reject" the Game, Section 8 of the License Agreement also requires that any rejection must be accompanied by a request for modification. After receiving the request for modifications, the Plaintiffs then "shall have the time allotted for approval of the Developer Materials [including the Game], and in the event that the requested modifications have not been corrected to the satisfaction of the Licensor, Licensor shall have the option of: (i) requiring Developer [Plaintiffs] to use best efforts to correct the Developer Materials [including the Game] and make the modifications or (ii) reject the Developer Materials [including the Game] as unsuitable for publication."

    14.    Pursuant to the terms of the License Agreement, Plaintiffs were required commercially launch the Game by one year after the effective date of August 15, 2016, which was extended by virtue of Amendment No. 1 to the License Agreement dated September 26, 2017 until April 15, 2018 (First Expiration Date) and then February 15, 2019 (Second Expiration Date) as a result of a payment to Defendants. Amendment No. 2 of the License Agreement dated July 25, 2019 further extended the Second Expiration Date until December 10, 2019 with another payment of $15,000 for Extension Compensation. The License Agreement provides that, if Plaintiffs had launched the digital version of the Game by making it commercially available to

consumers by that date, the License Agreement would be extended until twenty-four months following the commercial launch. If the Plaintiffs fail to commercially launch the Game, the term of the License Agreement shall expire.

15. Plaintiffs Bigben and Nacon also, separately, entered into an agreement with Epic Games, Inc. ("Epic Games"), which provides an online storefront for PC-based games. Plaintiffs intended to distribute the Game through Epic Games and Defendants were aware of this fact.

16. Since 2016, Plaintiffs have devoted substantial effort and financial resources toward the development and marketing of the Game. This included, taking the print and board version of the Game and converting it to a video game, which is a digital version of the Game based upon and incorporating its role-playing characters and places, things, artwork, storylines, plots, themes, rules, concepts and content.

17. On or about September 10, 2019, and pursuant to Section 8 of the License Agreement, Plaintiffs Cyanide and Bigben provided Defendants with the initial version of the Game (known as FlamingoStaging1) for their review and approval. On September 24, 2019, Defendant Goldberg rejected the Game stating:

> The Game itself is approvable or very close to approvable; if there had not been the serious bug and UX issues, we expect we would have found a way to approve the game version in the September 10 master – perhaps with the assurance that a patch would address a relatively few minor gameplay issues. We're in agreement with BigBen's and Cyanide Studio's recent assessments that the high points of the game are quite high indeed; and, while the game's commercial and critical prospects could be significantly improved with a few months' further development, we'd respect your developer and publisher prerogatives if you decide not to invest further toward a great *Paranoia* game with even better chances of achieving top-seller status."

18. After September 24, 2019, Defendants hired Ken Rolston, a computer game and role-playing game designer and an expert in this industry. Upon information and belief, Mr. Rolston was hired specifically to undertake quality assurance on the Defendants' behalf, perform

an evaluation of the Game, and work directly with Plaintiffs in order to address any concerns about the quality of the Game and request modifications, if they were needed.

19. Working directly with Mr. Rolston as Defendants' agent and representative, Plaintiffs Cyanide and Bigben made substantial efforts and addressed the purported major bugs that had been identified by Defendants, including the purported major "crash" bugs identified by Mr. Rolston acting on behalf of Defendants as their quality assurance expert.

20. In addition, on or about October 1, 2019, Plaintiffs Bigben and Cyanide retained in good faith Pole To Win, one of the leading global gaming quality assurance evaluators, customer experience and development service providers to ensure that the Game was without any major bugs which would prevent the commercial release of the Game.

21. On or about October 16, 2019, Plaintiffs provided a revised version of the Game (FlamingoStaging2) to Defendants for their review and approval. On October 16, 2019, Defendant Costikyan responded: "Every game ships with minor bugs. We understand that. . . . We are concerned to ensure that, upon launch, *Paranoia: Happiness is Mandatory* will be devoid of crash bugs, save bugs, blocking bugs, and ugly interface issues that make it difficult for new players o progress, or play effectively." Plaintiffs understood Mr. Rolston's email to reject the October 16, 2019 version.

22. On October 25, 2019, Defendant Goldberg stated in an email that "we hope and have some reason to believe [that the showstopper bugs] are an artifact of running the October 16 Epic release on PCs that previously ran versions delivered by Steam."

23. On October 28, 2019, Plaintiffs Cyandie and Bigben made a revised version of the Game (FlamingoStaging3) available to Defendants (and Mr. Rolston). After his review, upon information and belief, Mr. Rolston concluded that this updated October 28, 2019 version -

- FlamingoStaging 3 -- was without major bugs. Mr. Rolston, acting on behalf of Defendants, stated in a November 6, 2019 email that his job to ensure quality assurance was finished and that in his opinion the Game was ready for commercial release: "[M]y time with you draws to an end. . . . I look forward to actually playing the commercially released game."

24. In an attempt to take advantage of the tight timelines regarding the official release of the Game, Defendants, while still purporting to withhold their approval of the Game, sent Plaintiffs a proposed amendment to the License Agreement whereby Defendants would be willing to extend the term of the License Agreement if Plaintiffs paid Defendants additional compensation. Specifically, on November 4, 2019, Defendants sent a proposed Amendment No. 3 to the License Agreement, which would have required that Plaintiffs pay a $150,000 non-refundable payment, a $189,051.70 Exclusivity Advance, and a $25,000 weekly payment for every week that Defendants had purported that the Game had not been approved.

25. Plaintiffs objected to and refused to execute Amendment No. 3 because it was contrary to the terms and conditions of the License Agreement and was not warranted by the facts which indicated that the Game was without major bugs and ready for commercial release.

26. As part of the effort to get the Game ready for its launch, Plaintiffs suggested utilizing a separate independent quality assurance evaluator suggested by Defendants and Defendants agreed to Defendants' proposal. Specifically, on November 11, 2019, Defendant Goldberg stated: "Very good to receive a proposal for an alternate assurance to support an approval of the most recent 'candidate master'. Yes, of course, we'll support any reasonable way to get to an approvable version: as an independent opinion from a reputable game QA firm should make approval more possible, we can act on this proposal as soon as you're prepared to proceed."

27.     Toward that end, Defendants requested that Plaintiffs retain Quantic Lab S.r.l. ("Quantic Lab), a software outsourcing company specializing in quality assurance for gaming and applications as an independent third-party quality assurance evaluator.  Even though such an evaluation was not required by the License Agreement, Plaintiffs acceded to Defendants' request and hiredQuantic Lab and in a good faith effort to facilitate the successful launch of the Game.

28.     Quantic Lab specializes in high quality testing for games, entertainment software and business applications.  Following its analysis of the Game (FlamingoStaging3), Quantic Lab determined on November 25, 2019 that "the [Game] story could be finished without experiencing any critical defect, with the game play being fluent."  A copy of the Quantic Lab's report and conclusions were provided to Defendants on or about November 25, 2019.

29.     Quantic Labs's independent third-party analysis confirmed the determinations of both Mr. Rolston and Pole To Win that any "major, showstopping bugs" that might have existed prior to October 16, 2019 had been fixed as a part of the review of the October 16, 2019 version (FlamingoStaging2) and were not present in the version released to Defendants Goldberg and Costikyan on October 28, 2019 (FlamingoStaging3).

30.     As required by the License Agreement, Plaintiffs made all requested modifications to the Game requested by Defendants within thirty (30) days.  No further major bugs were identified by the Defendants (or any of the third-parties evaluators) nor did Defendants reject the Game or make any additional requests for modification.

31.     Notwithstanding the foregoing and the fact that Plaintiffs Cyanide and Bigben requested a response, Defendants did not expressly approve or reject the Game.  Thus, on December 6, 2020, relying upon (1) Defendants' representations that "we'll support any reasonable way to get to an approvable version: as an independent opinion from a reputable

game QA firm should make approval more possible, we can act on this proposal as soon as you're prepared to proceed," (2) the approval of Defendants' representative, Mr. Rolston, that the Game was ready for commercial launch and (3) the conclusions of Quantic Lab and Pole To Win, Plaintiffs launched the Game.  The Game's launch also was confirmed with Defendant Goldberg on December 6, 2020.  At the time, Defendants did not object or issue any requests for further modifications.

32.   On December 10, 2019, pursuant to Section 4(d) of the License Agreement, Plaintiff Cyanide wired to Defendants the required €20,000 license fee upon the launch of the Game.

33.   On December 11, 2019, Defendants contacted Plaintiffs Cyanide and Bigben stating that "the License Agreement expired yesterday, December 10, 2019."

34.   On or about December 13, 2019, Plaintiffs Cyanide and Bigben notified Defendants that the License Agreement had not expired.  As Plaintiffs Cyanide and Bigben told Defendants, because the Game has been "made commercially available to consumers" before December 10, 2019 pursuant to Section 2(b), the term of the License Agreement automatically extended to December 5, 2021.  Indeed, Plaintiff Cyanide paid Defendants €20,000 on December 10, 2019, in accordance with Plaintiff Cyandie's obligations following the launch of the Game, which served to extend the term of the License Agreement for an additional two (2) years.

35.   On or about December 21, 2019, Defendants demanded that Plaintiffs Cyanide and Bigben immediately pull the Game from the market notwithstanding the terms and conditions of the License Agreement.  Even if Defendants believed the License Agreement expired -- which it did not -- Plaintiffs would have been entitled to market, distribute, license, and sell the Game for a wind-down period.

36. Specifically, Section 15 of the License Agreement provides:

> In the event this Agreement expires in accordance with Section 2 . . . Developer shall have the right to continue to market, distribute, license and sell the Digital Game in accordance with this Agreement for the Wind-Down Period, subject to payment of Royalties. . . .The License Agreement defines the Wind-Down Period as "the three (3) month period after the termination of this Agreement.

37. Section 15 of the License Agreement requires that, in the event that Defendants wish to terminate the License Agreement for a material breach or failure to meet obligations by the Cyanide, Defendants must provide the Cyanide with written notice of a possible termination along with thirty days to cure the breach or meet the obligation. No notice was ever provided by Defendants as required under Section 15 of the License Agreement and no specific grounds given were nor were Plaintiffs Cyanide and Bigben afforded thirty days to cure any alleged breaches. For this reason, the License Agreement was never terminated.

38. On December 23, 2019, the Plaintiffs rejected Defendants' demand and noted that Defendants had approved the Game and had breached the duty of good faith and fair dealing and obligations under Section 8 of the License Agreement.

39. Notwithstanding any of the above, on or about January 21, 2020, Defendants served a DMCA Notice and Takedown Request upon Plaintiffs' licensee, Epic Games, which stated that:

> The distribution of *Paranoia: Happiness is Mandatory* via the Epic Games Stores constitutes copyright and trademark infringement, as neither BigBen Interactive, Black Shamrock, nor Cyanide had authorization or approval from Messrs. Goldberg and Costikyan to launch the game. In fact, the license agreement by which Cyanide originally obtained the right to build a game using [the] intellectual property has terminated, and neither Cyanide nor its affiliates have any right to distribute the game, as they repeatedly have been informed by us.

Defendants' statement is not accurate because Defendants Goldberg and Costikyan entered into the License Agreement with Plaintiff Cyanide by which Defendants Goldberg and Costikyan

licensed the right to develop the Game and the License Agreement has never been terminated by Defendants because no Notice of Termination was issued.

40. Defendants' contention that the License Agreement simply expired by its terms on December 10, 2019 also is erroneous because the Game had launched prior to the expiration on December 5, 2019, prior to expiration of the License Agreement after it had been approved by Mr. Rolston on behalf of Defendants and independently by Quantic Labs.

## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT

41. Plaintiffs repeat and reallege paragraphs 1 through 40 above, as if fully set forth herein.

42. The License Agreement was a valid and enforceable contract between Plaintiff Cyanide as its successors-in-interest Plaintiffs Bigben and Nacon and Defendants, which was entered into by Cyanide and Defendants on September 6, 2016, and amended on October 8, 2017 and July 25, 2019, respectively.

43. Plaintiffs Cyanide and Bigben performed all of their respective duties and obligations pursuant to the provisions of the License Agreement.

44. Section 8 of the License Agreement outlines the procedures by which Defendants were required to provide notice to Cyandie and Bigben in order to properly object to the release of the Game. Specifically, Section 8 requires that any rejection of the Game be done in "good faith." It also requires that any rejection be accompanied by a request for modifications.

45. Defendants did not give -- and have not given -- notice of any requests for modifications to the Game that have not otherwise been addressed by Plaintiffs.

46. Section 15 of the License Agreement specifies the procedures that Defendants were required to follow in the event that they wished to seek to terminate the License Agreement. Specifically, Section 15 requires:

> In the event of a material breach of this Agreement or failure to meet any of Developer's obligations, Licensor may terminate this Agreement by giving thirty (30) days' prior written notice thereof; provided, however, that this Agreement shall not terminate at the end of said thirty (30) day notice period if Developer has cured the breach or has met the obligation of which Developer has been notified prior to the expiration of said thirty (30) days.

47. Defendants did not -- and have not -- sent any notice of termination nor did they otherwise notify Plaintiffs of any material breach or failure to meet any of Plaintiffs' obligations.

48. Instead, Defendants simply issued a DMCA Notice and Takedown Request upon Plaintiffs' licensee, Epic Games, which misrepresented Defendants' rights over the Game.

49. As a direct and proximate result of Defendants' breach, Plaintiffs have suffered damages well in excess of $75,000, including but not limited to the lost monies devoted to the development of the Game and lost sales from the Game as the result of the wrongful acts of Defendants.

## SECOND CLAIM FOR RELIEF
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

50. Plaintiffs repeat and reallege paragraphs 1 through 49 above, as if fully set forth herein.

51. The License Agreement is a valid and enforceable contract between Plaintiff Cyanide and Plaintiffs Bigben and Nacon as its successors-in-interest, and Defendants, which was entered into by Cyanide and Defendants on September 6, 2016, and amended on October 8, 2017 and July 25, 2019, respectively.

52. Plaintiffs performed all duties and obligations owed by it pursuant to the provisions within the License Agreement, including but not limited to, delivery of the Game for

review by the Defendants and performing any reasonable and necessary modifications requested to ensure that the Game was ready for distribution.

53. In exchange for the performance of these duties, Plaintiffs reasonably expected that Defendants would properly review the Game, request specific modifications that were required in good faith, and approve the Game for distribution.

54. Defendants failed to meet its obligations and adhere to the procedures set forth in Section 8 of the License Agreement.  Upon information and belief, Defendants failed to do so because they believed that the License Agreement would expire if they improperly neglected to abide by the terms and procedures set forth in the License Agreement and withheld their approval.

55. Defendants conduct breaches the License Agreement and violates Plaintiffs' reasonable contractual expectations under the License Agreement.

56. As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing in the License Agreement, Plaintiffs have suffered substantial damages for which they are entitled to recover, which exceed $75,000.

## THIRD CLAIM FOR RELIEF
## WRONGFUL TERMINATION OF LICENSE AGREEMENT

57. Plaintiffs repeat and reallege paragraphs 1 through 56 above, as if fully set forth herein.

58. On October 28, 2019, Plaintiffs Cyanide and Bigben provided to Defendants and their agent Mr. Rolston a revised version of the Game (FlamingoStaging3) that was without major "crash" bugs and which Mr. Rolston, acting on behalf of Defendants, indicated on November 6, 2019 that in his opinion the Game was ready for commercial release.

59. Pole To Win confirmed that any "major, showstopping bugs" that purportedly as its successors-in-interest existed prior to October 16, 2019 were not present in the FlamingoStaging3 version of the Game that was released to Defendants Goldberg and Costikyan on or about October 28, 2019.

60. Quantic Lab concluded on November 25, 2019 that "the [Game] story could be finished without experiencing any critical defect, with the game play being fluent."

61. Defendants provided no notice of termination or any notice of any specified material alleged failures of performance obligations or providing Plaintiffs thirty days to cure any such alleged failures.

62. Notwithstanding Plaintiffs repeated requests for approval of the Game and notice of any alleged specified material failures of performance obligations, defendants refused and/or neglected to provide any such notice or any information regarding any basis for termination so that Plaintiffs could not make any attempt to cure any such alleged failures of performance, if they existed.

63. As a direct and proximate result of Defendants' wrongful termination of the License Agreement, Plaintiffs have suffered substantial damages for which they are entitled to recover, which Awarding damages for breach and wrongful termination of the License Agreement exceed $75,000.

WHEREFORE, Plaintiffs respectfully demand judgment as follows:

1) That a permanent injunction be issued enjoining Defendants, any entity owned and/or controlled in whole or in part by Defendants, and the partners, officers, agents, privies, shareholders, principals, directors, licensees, attorneys, servants, employees, affiliates,

subsidiaries, successors, and assigns of any such entities and all others in active concert or participation with any of them from filing a DMCA Takedown Notice against the Game;

       2)      Awarding damages for breach and wrongful termination of the License Agreement;

       3)      Awarding damages for the Defendants' breach of the duty of good faith and fair dealing;

       4)      Awarding Plaintiffs such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial of its causes of action herein before a jury.

Respectfully submitted,

SHEPPARD MULLIN RICHTER & HAMPTON LLP

New York, New York
Dated: April 21, 2022

s/Theodore C. Max
Theodore C. Max
30 Rockefeller Plaza
New York, New York 10112
Telephone: 212-653-8700
Facsimile: 212-653-8701

*Attorneys for Plaintiffs
Bigben Interactive S.A., Nacon S.A.
and Cyanide S.A.*