**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

BIGBEN INTERACTIVE S.A., NACON S.A.,
and CYANIDE S.A.S.,

                     Plaintiffs,

          -against-

ERIC GOLDBERG and GREG COSTIKYAN

                   Defendants.

------------------------------------------------------------X

Civil Action No. 1:21-cv-08698 (DLC)
(GWG)

**DEFENDANTS' ANSWER TO**
**FIRST AMENDED COMPLAINT**
**AND COUNTERCLAIMS**

      Defendants Eric Goldberg ("Goldberg") and Greg Costikyan ("Costikyan") (collectively, "Defendants"), by and through their attorneys, Frankfurt Kurnit Klein + Selz, P.C., hereby submit this Answer to the First Amended Complaint filed by Bigben Interactive S.A. ("Bigben"), Nacon S.A. ("Nacon"), and Cyanide, S.A.S. ("Cyanide") (collectively, "Plaintiffs"), and state as follows:

## ANSWER

## <u>SUBSTANCE OF THE ACTION[1]</u>

      1.     Defendants admit that they are game designers and that they entered into a license agreement with Plaintiff Cyanide on September 6, 2016, aver that the License Agreement speaks for itself and refer to it for its terms, and deny any allegation in Paragraph 1 inconsistent therewith. Defendants are without knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 1 and on that basis deny them.

---

[1] This Answer reproduces the headings from the First Amended Complaint verbatim solely for the Court's convenience and ease of reference. The Defendants' use of these headings are not admissions as to the truth of any allegations contained therein.

2.      Defendants deny the allegations in Paragraph 2, except aver that Plaintiffs launched an unapproved version of the digital *Paranoia* game (the "Digital Game") on Epic Games, Inc. ("Epic") and admit that they sent a DMCA takedown notice to Epic on January 21, 2020.

## PARTIES

3.      Defendants admit that Cyanide is a video game developer.  Defendants are without knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 3 and on that basis deny them.

4.      Defendants admit that Bigben is a video game publisher and distributor. Defendants are without knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 4 and on that basis deny them.

5.      Defendants are without knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 5 and on that basis deny them.

6.      Defendants admit the allegation in Paragraph 6.

7.      Defendants admit the allegation in Paragraph 7.

## JURISDICTION AND VENUE

8.      Paragraph 8 consists of legal conclusions to which no response is required.  To the extent a response may be required, Defendants admit that they are citizens of New York State and that Plaintiffs assert that the amount in controversy exceeds $75,000, but Defendants are without knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 8 and on that basis deny them.

9.      Paragraph 9 consists of legal conclusions to which no response is required.  To the extent a response may be required, Defendants aver that the License Agreement speaks for itself and refer to that document for its terms and deny any allegation in Paragraph 9 inconsistent therewith.

10.    Paragraph 10 consists of legal conclusions to which no response is required.  To the extent a response may be required, Defendants aver that the License Agreement speaks for itself and refer to that document for its terms and deny any allegation in Paragraph 10 inconsistent therewith.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

11.    Defendants admit that on September 6, 2016, they entered into the License Agreement with Plaintiff Cyanide in order to develop the Digital Game for use on PC and/or a console video game platform, and aver that the License Agreement was amended by way of Amendment No. 1, effective September 18, 2017, and Amendment No. 2, effective June 30, 2019.

12.    Defendants aver that the License Agreement speaks for itself and refer to that document for its terms, and deny any allegations in Paragraph 12 inconsistent therewith.

13.    Defendants aver that the License Agreement speaks for itself and refer to that document for its terms, and deny any allegations in Paragraph 13 inconsistent therewith.

14.    Defendants aver that the License Agreement speaks for itself and refer to that document for its terms, and deny any allegations in Paragraph 14 inconsistent therewith.

15.    Defendants are without knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 15 and on that basis deny them, except admit that Defendants were aware that Plaintiff Bigben intended to distribute the Digital Game through Epic, an online storefront for PC-based games.

16.    Defendants are without knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 16 and on that basis deny them, except admit that the Digital Game was intended to be a video game that incorporated the print and board version of the *Paranoia* tabletop game's role-playing characters and place, things, artwork, storyline, plots, themes, rules, concepts, and content.

17.     Defendants admit that on September 10, 2019 Plaintiffs provided Defendants with a version of the Digital Game for their review and approval, and that Defendants rejected this version of the Digital Game.  Defendants deny the remaining allegations in Paragraph 17.

18.     Defendants deny the allegations in Paragraph 18.

19.     Defendants deny the allegations in Paragraph 19.

20.     Defendants are without knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20 and on that basis deny them.

21.     Defendants admit that on October 16, 2019, Plaintiffs provided a revised version of the Digital Game to Defendants, admit that on that date, Defendant Costikyan sent an email and refer to that email for its contents, and deny any allegation in Paragraph 21 inconsistent therewith.

22.     Defendants admit that on October 25, 2019, Defendant Goldberg sent an email to Defendant Costikyan and Plaintiff Cyanide, refer to that email for its contents, and deny any allegation in Paragraph 22 inconsistent therewith.

23.     Defendants deny the allegations in Paragraph 23, except admit that on October 28, 2019, Plaintiffs Cyanide/Bigben sent an email to Defendants, refer to that email for its contents, and deny any allegation in Paragraph 23 inconsistent therewith.

24.     Defendants deny the allegations in Paragraph 24, except aver that on November 3, 2019, Defendant Goldberg sent an email to Plaintiffs, refer to that email for its contents, and deny any allegation in Paragraph 24 inconsistent therewith.

25.     Defendants deny the allegations in Paragraph 25.

26.     Defendants deny the allegations in Paragraph 26, except admit that on November 11, 2019 Defendant Goldberg sent an email to Plaintiff Cyanide, refer to that email for its contents, and deny any allegation in Paragraph 26 inconsistent therewith.

27.     Defendants deny the allegations in Paragraph 27, aver that on November 12, 2019 Defendant Goldberg sent two emails to Plaintiffs, refer to those emails for their contents, and deny any allegation in Paragraph 27 inconsistent therewith.

28.     Defendants are without knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 28 and on that basis deny them.

29.     Defendants deny the allegations in Paragraph 29.

30.     Defendants deny the allegations in Paragraph 30.

31.     Defendants deny the allegations in Paragraph 31, except aver that Plaintiffs launched an unapproved version of the Digital Game on December 5, 2020.

32.     Defendants deny the allegations in Paragraph 32, except aver that Plaintiffs sent $21,704 to Defendants on December 10, 2019.

33.     Defendants admit that on December 11, 2019, Defendant Goldberg sent Plaintiffs an email, refer to that email for its contents, and deny any allegation in Paragraph 33 inconsistent therewith.

34.     Defendants deny the allegations in Paragraph 34, except admit that Plaintiffs sent an email on December 13, 2019 and refer to that email for its contents.

35.     Defendants deny the allegations in Paragraph 35, except aver that on December 20, 2019, Defendants sent a letter to Plaintiffs, refer to that letter for its contents, and deny any allegation in Paragraph 35 inconsistent therewith.

36.     Defendants aver that the License Agreement speaks for itself and refer to that document for its terms, and deny any allegation in Paragraph 36 inconsistent therewith.

37.     Defendants deny the allegations in Paragraph 37, aver that the License Agreement speaks for itself and refer to that document for its terms, and deny any allegation in Paragraph 37 inconsistent therewith.

38.     Defendants deny the allegations in Paragraph 38, aver that on December 23, 2019, Plaintiffs sent Defendants a letter, refer to that letter for its contents, and deny any allegation in Paragraph 38 inconsistent therewith.

39.     Defendants deny the allegations in Paragraph 39, except admit that Defendants sent Epic a DMCA takedown notice on January 21, 2020.

40.     Defendants deny the allegations in Paragraph 40.

## FIRST CLAIM FOR RELIEF
### Breach Of Contract

41.     Defendants incorporate by reference their responses to the allegations in the preceding paragraphs of this Answer.

42.     Defendants admit that they entered into a valid and enforceable License Agreement with Plaintiff Cyanide on September 6, 2016, aver that the License Agreement was amended on or about September 26, 2017 and on or about July 25, 2019, and deny any remaining allegations in Paragraph 42.

43.     Defendants deny the allegations in Paragraph 43.

44.     Defendants aver that the License Agreement speaks for itself and refer to that document for its terms, and deny any allegation in Paragraph 44 inconsistent therewith.

45.     Defendants deny the allegations in Paragraph 45.

46.     Defendants aver that the License Agreement speaks for itself and refer to that document for its terms, and deny any allegation in Paragraph 46 inconsistent therewith.

47.     Defendants deny the allegations in Paragraph 47.

48.     Defendants deny the allegations in Paragraph 48, except admit that they sent a DMCA takedown notice to Epic.

49.     Defendants deny the allegations in Paragraph 49.

## SECOND CLAIM FOR RELIEF
### Breach of Duty of Good Faith and Fair Dealing

50.     Defendants incorporate by reference their responses to the allegations in the preceding paragraphs of this Answer.

51.     Defendants admit that they entered into a valid and enforceable License Agreement with Plaintiff Cyanide on September 6, 2016, aver that the License Agreement was amended on or about September 26, 2017 and on or about July 25, 2019, and deny any remaining allegations in Paragraph 51.

52.     Defendants deny the allegations in Paragraph 52.

53.     Defendants are without knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 53 and on that basis deny them.

54.     Defendants deny the allegations in Paragraph 54.

55.     Defendants deny the allegations in Paragraph 55.

56.     Defendants deny the allegations in Paragraph 56.

## THIRD CLAIM FOR RELIEF
### Wrongful Termination of License Agreement

57.     Defendants incorporate by reference their responses to the allegations in the preceding paragraphs of this Answer.

58.     Defendants deny the allegations in Paragraph 58, except admit that on October 28, 2019 Plaintiffs provided Defendants with a version of the Digital Game.

59.     Defendants are without knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 59 and on that basis deny them.

60.     Defendants are without knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 60 and on that basis deny them.

61.     Defendants deny the allegations in Paragraph 61.

62.     Defendants deny the allegations in Paragraph 62.

63.     Defendants deny the allegations in Paragraph 63.

## AFFIRMATIVE DEFENSES

Without altering the burden of proof, Defendants assert the following defenses. These defenses are asserted based upon Defendants' preliminary investigation of the asserted allegations, which is not yet complete and will remain so pending discovery in this matter.   Defendants therefore reserve all affirmative defenses under Fed. R. Civ. P. 8(c), and any other defense at law or equity that many now exist or in the future be available based on discovery and further investigation.

### First Affirmative Defense
### (Failure to State a Claim)

The Complaint fails to state facts sufficient to state a claim upon which relief may be granted against Defendants.

### Second Affirmative Defense
### (Breach of the Implied Duty of Good Faith and Fair Dealing)

Plaintiffs' claims against Defendants are barred, in whole or in part, because Plaintiffs breached the implied duty of good faith and fair dealing.

### Third Affirmative Defense
### (Estoppel)

Plaintiffs' claims against Defendants are barred, in whole or in part, by the doctrine of estoppel.

### Fourth Affirmative Defense
### (Laches)

8

Plaintiffs' claims against Defendants are barred, in whole or in part, by the doctrine of laches.

### Fifth Affirmative Defense
**(Waiver)**

Plaintiffs' claims against Defendants are barred, in whole or in part, by the doctrine of waiver.

### Sixth Affirmative Defense
**(Limitation of Liability)**

Plaintiffs' claims against Defendants are barred, in whole or in part, by the limitation of liability as defined and agreed to in the License Agreement.

### Seventh Affirmative Defense
**(No Breach)**

Plaintiffs' claims against Defendants are barred, in whole or in part, because Defendants performed all duties owed to Plaintiffs under the License Agreement, other than duties which were prevented or excused by Plaintiffs' actions or inactions.

### Eighth Affirmative Defense
**(Prevention of Performance)**

Plaintiffs' claims against Defendants are barred, in whole or in part, because Plaintiffs prevented Defendants from performing under the License Agreement.

### Ninth Affirmative Defense
**(Prior Breach)**

Plaintiffs' claims against Defendants are barred, in whole or in part, because Plaintiffs' prior breach of the License Agreement discharged Defendants' performance under the License Agreement.

## Tenth Affirmative Defense
### (Material Breach)

Plaintiffs' claims against Defendants are barred, in whole or in part, because Plaintiffs' material breach of the License Agreement discharged Defendants' performance under the License Agreement.

## Eleventh Affirmative Defense
### (No Willful or Intentional Conduct)

To the extent the Court finds any actionable conduct by Defendants, Defendants did not act willfully or intentionally.

## Twelfth Affirmative Defense
### (Justification)

To the extent Defendants engaged in any of the acts complained of, such acts were performed fairly, in good faith, and for a lawful purpose, and were reasonable and justified under the then-operative circumstances.

## Thirteenth Affirmative Defense
### (No Damages)

Plaintiffs' claims against Defendants are barred, in whole or in part, because Plaintiffs' purported damages, if any, are vague, uncertain, imaginary, and speculative.

## Fourteenth Affirmative Defense
### (Failure to Mitigate Damages)

Plaintiffs have failed to take reasonable steps to reduce or minimize their alleged damages.

## DEFENSES RESERVED

Defendants do not currently have sufficient knowledge or information on which to form a belief as to whether they have additional affirmative defenses available. Defendants reserve the right to amend this Answer up to and through the time of trial to assert any additional affirmative

defenses permitted under New York law, when and if, during the course of their investigation, discovery, or preparation for trial, it becomes appropriate to assert such affirmative defenses.

WHEREFORE, Defendants respectfully request that this Court enter judgment against Plaintiffs as follows:

(a)    Dismissing Plaintiffs' First Amended Complaint in its entirety with prejudice;

(b)    Awarding Defendants their reasonable costs and attorneys' fees; and

(c)    Awarding Defendants such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

Counterclaim-Plaintiffs Eric Goldberg and Greg Costikyan (collectively, "Counterclaim-Plaintiffs") hereby assert counterclaims against Counterclaim-Defendants Bigben, Nacon, and Cyanide (collectively, "Counterclaim-Defendants") and state as follows:

## NATURE OF THE ACTION

1.    Counterclaim-Plaintiffs seek to recover damages from Counterclaim-Defendants based on Counterclaim-Defendants' breach of contract, violation of their duty of good faith and fair dealing, and infringement on Counterclaim-Plaintiffs' copyright and trademark. Counterclaim-Plaintiffs further seek an order from this Court declaring that the License Agreement terminated on December 10, 2019, declaring that Counterclaim-Defendants' failure to perform under the License Agreement discharged Counterclaim-Plaintiffs' performance under the License Agreement, and enjoining Counterclaim-Defendants from further infringement of Counterclaim-Plaintiffs' copyright and trademark.

## THE PARTIES

2.    At all relevant times, Counterclaim-Plaintiff Eric Goldberg is and was an individual residing in New York.

3.      At all relevant times, Counterclaim-Plaintiff Greg Costikyan is and was an individual residing in New York.

4.      Upon information and belief, Counterclaim-Defendant Bigben is a French corporation with its principal place of business in Fretin, France.

5.      Upon information and belief, Counterclaim-Defendant Nacon is a French corporation with its principal place of business in Fretin, France.

6.      Upon information and belief, Counterclaim-Defendant Cyanide is a French limited liability company with its principal place of business in Nanterre, France.

## JURISDICTION

7.      The Court has subject matter jurisdiction pursuant to diversity jurisdiction under 28 U.S.C. § 1332 because Counterclaim-Plaintiffs are U.S. citizens and Counterclaim-Defendants are citizens of a foreign state and the amount in controversy exceeds $75,000.  The Court also has subject matter jurisdiction over the third counterclaim for Copyright infringement pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (copyright) because Counterclaim-Plaintiffs' claims depend upon resolution of questions of federal law that arise under the Copyright Act. Federal courts have exclusive jurisdiction of matters arising under the Copyright Act. 28 U.S.C. § 1338(a).  The Court also has subject matter jurisdiction over the fourth and fifth counterclaims for Trademark infringement pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 (federal question) and 1338(a) and (b) (trademark and unfair competition) because Counterclaim-Plaintiffs' claims depend upon resolution of questions of federal law that arise under the Lanham Act.  28 U.S.C. § 1338(a).  The Court also has subject matter jurisdiction over all counterclaims pursuant to 28 U.S.C. § 1367 because the counterclaims are compulsory counterclaims under Federal Rule of Civil Procedure 13(a) to claims for relief pleaded in the Complaint, and thus necessarily arise out of the same transaction or occurrence such that it is part of the same case or controversy under

Article III of the United States Constitution. The Court further has subject matter jurisdiction over the eighth counterclaim for Declaratory Relief pursuant to 28 U.S.C. § 2201.

8.      The Court has personal jurisdiction over Counterclaim-Defendants because Counterclaim-Defendants submitted to the Court's jurisdiction when they filed the First Amended Complaint against Counterclaim-Plaintiffs in this Court and these counterclaims are compulsory counterclaims to that action under Federal Rule of Civil Procedure 13(a).  The Court also has personal jurisdiction over Counterclaim-Defendants because Section 16.1 of the License Agreement provides that "[j]urisdiction for litigation of any dispute, controversy or claim arising out of or in connection with this Agreement, or breach thereof, shall be only in the federal or the state court with competent jurisdiction located in New York City."

9.      Venue is proper in this district because Counterclaim-Defendants consented to venue in this district when they filed the First Amended Complaint against Counterclaim-Plaintiffs in this Court and these counterclaims are compulsory counterclaims to that action under Federal Rule of Civil Procedure 13(a).

## FACTUAL ALLEGATIONS

10.      Eric Goldberg and Greg Costikyan are veteran game designers who have been designing role-playing games individually and together for over forty years.  In the early 1980s, they co-developed *Paranoia*, a science-fiction tabletop role-playing game where players are encouraged to lie, betray, and sabotage one another in a humorous but dystopian setting.  *Paranoia* was first published in 1984 by West End Games and has received critical and fan acclaim, including being inducted into the Origins Awards Hall of Fame in 2007.

11.      Since 1984, there have been six editions of the *Paranoia* tabletop role-playing game, as well as several spin-offs, including novels, a comic book, and a video game released in

the late 1980s.  All of these works have used the *Paranoia* copyrights and distinctive PARANOIA word mark (the "Paranoia Mark") that has also come to be associated by relevant consumers with the high quality and respected *Paranoia* game franchise.

12.     The *Paranoia* copyrights were registered with the United States Copyright Office ("Copyright Office") on January 6, 1986, with Registration Nos. TX-736-315, TX-1-734-014, TX-1-734-013, TX-1-733-682, and TX-1-727-368.  Another *Paranoia* copyright was registered with the Copyright Office on May 23, 1991, with Registration No. TX-3-089-845 (collectively, the "*Paranoia* Copyrights"). On August 2000, West End Games assigned ownership of the *Paranoia* Copyrights to Goldberg and Costikyan, which was recorded with the Copyright Office on August 21, 2000, Document No. V3456D919.  Goldberg and Costikyan have since registered the copyright in the visual material for the electronic file of *Paranoia* with the Copyright Office on December 17, 2019, Registration No. VA0002185052, and registered the copyright in the Video Game audio-visual and text output for the *Paranoia: Happiness is Mandatory* computer file on February 24, 2020, Registration No. VA0002192590 (collectively, the "*Paranoia* Digital Game Copyrights").

13.     Goldberg and Costikyan are the owners of all right, title, and interest in and to the Paranoia Mark, which was registered with the United States Patent and Trademark Office ("USPTO") for "role playing games" as U.S. Registration No. 5,316,218.  Goldberg and Costikyan and their authorized licensees have used, advertised, promoted, distributed and sold the *Paranoia* tabletop game and affiliated goods with the Paranoia Mark in interstate commerce, including in New York State, since the mid-1980s.

**Goldberg and Costikyan Enter Into License Agreement with Cyanide to Develop a High Quality Digital Game of *Paranoia***

14.     In early 2016, Goldberg and Costikyan began negotiations with Cyanide S.A.S., a French video game developer, about a licensing arrangement that would allow Cyanide to develop

a digital version of the *Paranoia* role playing game (the "Digital Game").  Goldberg and Costikyan made clear throughout their negotiation with Cyanide that their utmost priority in the development of a Digital Game was the overall quality and user experience of the game to maintain and protect the value of their *Paranoia* intellectual property ("IP"), including the *Paranoia* brand.

15.     Despite receiving a more lucrative offer from another digital game developer, Goldberg and Costikyan entered into a license agreement with Cyanide in large part because of the assurances Cyanide made regarding the care and effort it would put into creating a high quality digital role-playing game that was consistent with the *Paranoia* brand and IP.

16.     On September 6, 2016, Goldberg and Costikyan entered into a license agreement with Cyanide to develop the Digital Game.  A true and correct copy of the License Agreement is attached hereto as Exhibit 1.

**Changes in Software Developer Lead to Delays and Require Extensions of the License Agreement**

17.     Section 2 of  the License Agreement sets forth terms and deadlines governing the development, publishing, and launch of the Digital Game.  Per Section 2, Cyanide and Bigben were required to commercially launch the Digital Game within one year of the effective date of August 15, 2016 (First Expiration Date), with that date being extended to February 15, 2019 (Second Expiration Date) if either of the following occurred prior to or by the First Expiration Date: (a) Cyanide and a third-party game publisher (approved by Goldberg and Costikyan) entered into an agreement to publish the Digital Game; or (b) Cyanide chose to self-publish the Digital Game, and provided written notice and a reasonably detailed Self-Publishing Plan to Goldberg and Costikyan for review and approval.  The License Agreement further set out that, if the Digital Game was to be launched on or before the Second Expiration Date, the terms of the Agreement

would automatically be extended for twenty-four months after the commercial launch date (Third Expiration Date).

18.     During the License Agreement negotiations, Cyanide represented to Goldberg and Costikyan that it would develop the software for the Digital Game.  In the summer of 2017, however, Cyanide subcontracted the development of the Digital Game's software to Black Shamrock, an Irish game developer with comparatively minimal experience developing computer role-playing games similar in style to *Paranoia*.

19.     Due to delays in developing the software for the Digital Game, the parties twice extended the terms of the License Agreement.  The First Amendment to the License Agreement ("Amendment No. 1") extended the First Expiration Date to April 18, 2017 and the Second Expiration Date to July 1, 2019.  The Second Amendment to the License Agreement ("Amendment No. 2") extended the Second Expiration Date to December 10, 2019. True and correct copies of Amendment Nos. 1 and 2 of the License Agreement are attached hereto as Exhibits 2 and 3, respectively.

20.     In Amendment No. 1, Cyanide also provided notice of its intent, pursuant to Section 2 of the License Agreement, to self-publish the Digital Game.  To that end, in April 2018, Cyanide sent Goldberg and Costikyan a Self-Publishing Plan composed of a marketing plan and a distribution plan indicating Cyanide's intention to distribute the Digital Game through various platforms, including Steam (a video game digital distribution service that includes an online storefront and mobile applications), GOG Ltd. ("GOG") (a digital distribution platform for video games and firms), and various other PC and console digital stores, including but not limited to: Amazon, Greenman Gaming, Humble Bundle Store, PlayStation Store, and Xbox Marketplace.

The Epic Game Store ("Epic") was not mentioned in the marketing or distribution plan provided to Goldberg and Costikyan in April 2018.

21.     Upon information and belief, in May 2018, Bigben Interactive S.A., a video game publisher and distributor, acquired Cyanide, S.A., a video game developer.

22.     Following their acquisition, Cyanide moved to self-publish the Digital Game through Bigben. Thus, in Amendment No. 2, Goldberg and Costikyan provided written approval of Cyanide's decision to self-publish the Digital Game through Bigben, but requested that "Licensee will submit its final Self-Publishing Plans to Licensor for approval prior to the Commercial Launch."  It was understood that the final Self-Publishing Plan would include a reasonably detailed marketing plan and distribution plan that would accurately reflect the platforms on which Cyanide/Bigben would launch the Digital Game, as well as how the Digital Game would be advertised to consumers through various channels, including but not limited to: social media (such as Facebook and Twitter), Reddit, digital ads, and press kits.

**Cyanide and Bigben Repeatedly Violate the License Agreement and Push for Quick Approval of Subpar, Buggy Digital Game**

23.     Section 8 of the License Agreement defines Goldberg and Costikyan's Approval Rights, which include "the right of approval for all Digital Games under this Agreement, including all updates and upgrades, and all *marketing materials, advertisements, web pages*, DLC and other collateral developed or used by Developer [Cyanide] in connection with the Digital Games."  Ex. 1 (emphasis added).

24.     In mid-August 2019, Bigben requested Goldberg and Costikyan's approval over a press release advertising: (1) that Bigben had entered into a one-year exclusive agreement with Epic; and (2) that Bigben intended to launch the *Paranoia* game exclusively on Epic beginning on October 3, 2019.  This was the first time Goldberg or Costikyan had heard about any relationship

between Bigben and Epic, or had heard of a proposed release date of October 3.  At this point, no version of the Digital Game had been provided to Goldberg or Costikyan for review subject to their Section 8 approval rights, and the last (and only) marketing and distribution plan that Goldberg or Costikyan had seen indicated plans to distribute the Digital Game on Steam.  Given that none of this information had been provided to Goldberg or Costikyan for review, subject to their rights as outlined in Sections 2, 3.1, and 8 of the License Agreement, as well as their concern about advertising a potentially unrealistic release date, they did not approve the press release.  In the first of what would become many breaches of their contractual duties, Bigben/Cyanide issued the unapproved press release on August 26, 2019.

25.     At the time that Bigben entered into an exclusive arrangement with Epic, Epic had only approximately 32 million monthly active users ("MAU"), as compared to Steam's 95 million MAU, as well as the millions of additional MAU from GOG, Amazon, Greenman Gaming, and the other platforms mentioned in the April 2018 marketing plan.

26.     Upon information and belief, Epic paid Cyanide/Bigben several millions of dollars in exchange for the exclusive release of the *Paranoia* Digital Game.

27.     It took almost three years after the License Agreement formed for Cyanide/Bigben to provide Goldberg and Costikyan with the first version of the Digital Game for review subject to their Section 8 approval rights. On September 10, 2019—exactly three months before the Second Expiration date—the first version of the Digital Game was provided to Goldberg and Costikyan for Section 8 review via an email titled "PC master for approval."  Despite contractually having six weeks to review the Digital Game, the September 10 version was so obviously unfit for publication that it took Goldberg and Costikyan only two weeks to provide feedback in accordance with Section 8 of the License Agreement.  On September 24, they officially rejected the September

10 version of the Digital Game because "software bugs and inconsistent/poor user experience issues" had produced "a product significantly below commercial standards" and "release of this version would tarnish the [*Paranoia*] brand."  In their written rejection, Goldberg and Costikyan highlighted the specific, major software bugs and issues they encountered, and also notified Cyanide/Bigben of improper credits in the "Created by" roll, in violation of  Section 9 of the License Agreement.

28.    Despite this detailed and explicit rejection, Bigben/Cyanide persisted, telling Goldberg and Costikyan that—despite receiving their written rejection the day before and in clear violation of the License Agreement—they intended to send a build of the rejected September 10 version of the Digital Game to Epic for distribution.  It was not until after Goldberg sent *another* email on September 27 referencing his rejection and again stating that "the version of the game provided on September 10 is rejected and therefore is not licensed for distribution, licensing or sale under the License Agreement" that Bigben/Cyanide backed down, eventually admitting that the September 10 version was not ready for publication "because of the severity of some of the bugs remaining."

29.    Unfortunately, Cyanide and Bigben did not learn from their mistake of setting an unrealistic release date.  In early October 2019—only two weeks after Goldberg and Costikyan rejected the prior version of the Digital Game because of severe deficiencies—Bigben again sent a draft press release to Goldberg and Costikyan for approval, this time advertising a new (second) launch date of November 14.  At the time Goldberg and Costikyan received this new press release, they had not been provided with a new version of the Digital Game for review subject to Section 8.  Goldberg told Bigben that they "do not have sufficient visibility to comment on, let alone approve, a November 14 release date" given that "the most recent version of the software required

our disapproval, and we've yet to see an improved version since then." He underscored that he and Costikyan were "concerned that there not be additional and avoidable announcements of further delays."

30.     Throughout the development of the Digital Game, Cyanide/Bigben told Goldberg and Costikyan that December is a bad time to launch the Digital Game, as it is when many high-profile titles are released and an oversaturated market would likely dampen sales.

31.     On October 16, 2019, in an email titled "PC master for approval," Cyanide/Bigben provided Goldberg and Costikyan with a new version of the Digital Game for review subject to Section 8 of the License Agreement. That same day, Bigben again requested approval of a press release to be distributed to the media, with the same November 14, 2019 anticipated release date.

32.     The day after receiving the October 16 version of the Digital Game, Goldberg wrote to Cyanide and Bigben, confirmed receipt of the Digital Game, and ensured that he and Costikyan would provide their Section 8 feedback by November 27, as provided for in the License Agreement. Noting Cyanide and Bigben's desire to have a version of the Digital Game published in mid-November, Goldberg and Costikyan offered potential routes to arrive at a mutually agreeable launch date and requested concrete assurances of quality to assist them in a speedier review, including lists of major and minor bugs and clarity into how Cyanide/Bigben distinguished between the two.

33.     Separately, Goldberg rejected the draft press release, emphasizing that "the game is not yet final and approved" and "we cannot approve materials for release with this date -- at this point, there's no evident way that November 14 is possible." Goldberg and Costikyan later learned that Bigben again violated the License Agreement by releasing the unapproved press release to the media publicizing an improbable November 14, 2019 release date.

34.     Between October 18 and October 28, Cyanide and Bigben repeatedly pushed Goldberg and Costikyan to complete their Section 8 review in time for a November 14 launch date, but never provided Goldberg nor Costikyan with any of the concrete assurances of quality they had explicitly and repeatedly requested.  When Cyanide did finally share a major bug list with Goldberg and Costikyan on October 28, there were at least 11 major bugs present in the Digital Game.  On that day, Cyanide/Bigben also shared a new version of the Digital Game with Goldberg and Costikyan (via an email titled "new build") but did not request formal review of this version pursuant to Section 8 of the License Agreement.

35.     Per Amendment No. 2, Cyanide/Bigben were required to submit a final Self-Publishing Plan prior to commercial launch of the Digital Game. On October 29, Cyanide/Bigben sent Goldberg the first marketing plan since Bigben entered into the exclusive agreement with Epic, but sent a short plan that did not reflect the exclusive nature of the Epic arrangement.

36.     After weeks of receiving from Cyanide/Bigben few, if any, concrete assurances of quality, but an inordinate amount of pressure to review the Digital Game on an expedited timeframe, Goldberg sent Cyanide and Bigben an email explaining the untenable situation Cyanide/Bigben had created.  He stated that, while he and Costikyan want to find a way to approve the PC game for publication, they are currently "not in a position to do that," as an early November date is "insufficient time to complete an adequate approval review."  Goldberg reiterated that they were still missing information requested and required by the License Agreement, namely: a distribution plan according to Amendment No. 2 and Section 2 of the License Agreement; a minor bug list, as they "currently do not have a reference for determining whether bugs deemed minor by BigBen, Cyanide Studio or perhaps retained QA consultants are not in fact major"; and a

marketing plan that, unlike the one sent on October 29, is reasonably detailed and accurately reflects the exclusive relationship with Epic.

37.    When Cyanide finally did provide Goldberg and Costikyan with a list of minor bugs in the Digital Game, 44 minor bugs were listed; upon review, at least one bug listed as minor was actually major. A few days later, on November 6, Cyanide provided Goldberg and Costikyan with a new spreadsheet listing 74 combined major and minor bugs still existing in the Digital Game.

38.    In the midst of these persistent bug and software issues, Cyanide offered to hire an independent third-party quality assurance firm to review the Digital Game. Goldberg and Costikyan agreed to this proposal, noting that they would "support any reasonable way to get to an approvable version" of the Digital Game, and agreed to work with Cyanide and Bigben to select the QA firm Quantic Lab ("Quantic"). Goldberg and Costikyan requested that the QA firm "submit their findings to [Goldberg and Costikyan] directly and simultaneously with their reports to Cyanide Studio and BigBen[,]" and made explicitly clear that while they were agreeing to Cyanide/Bigben's suggestion of hiring Quantic, they were "not agreeing to use the results of this QA effort as some type of waiver" of their approval rights pursuant to Section 8 of the License Agreement. Cyanide/Bigben acknowledged that they were "not asking for a waiver."

39.    On November 25, 2019, Cyanide/Bigben sent Goldberg an email with an attachment to what they called the "full marketing plan," which linked to the same short marketing plan provided to Goldberg on October 29 that did not reflect the exclusive relationship with Epic.

40.    Despite requesting that Quantic send their findings directly to Goldberg and Costikyan, on November 25, Cyanide sent Goldberg an email attaching page 1 of Quantic Lab's "Feedback Report," which focused primarily on the gameplay rather than the software and briefly

noted that "[f]unctional wise, some issues have been experienced."  Nothing else from Quantic was ever provided to Goldberg or Costikyan beyond this single page.

41.     On November 26, Goldberg and Costikyan informed Cyanide and Bigben that they were rejecting the October 16 version of the Digital Game because of their "review of the software; the known and disclosed Major Bugs; the continued lack of information about the resolution of Major Bugs and the identification of new Major Bugs, if any" as well as Cyanide and Bigben's continued failure to address their breaches of the License Agreement.  They noted that while Quantic reviewed the gameplay, the major issue for approval has consistently been "the performance of the software," which page 1 of Quantic's Feedback Report "does not appear to address."  Despite their rejection, Goldberg and Costikyan informed Cyanide and Bigben that they were willing to work with them "to find a solution to publish the PC Game to commercial standard and in compliance with the License Agreement," and "instead of issuing a 'Final Rejection' now, we ask that you continue to use best efforts to identify and resolve major bugs and address the other reasons for our rejection."

**Cyanide and Bigben Move Forward with Secret Launch of Unapproved Digital Game in Attempt to Wrongfully Extend License Agreement**

42.     The day after receiving Goldberg and Costikyan's rejection of the October 16 version of the Digital Game, Cyanide again requested grant approval "over the most recent version of the Game . . . so as to allow a release no later than December 5, 2019."  Goldberg responded to Cyanide's email, but did not alter his rejection as expressed on November 26.

43.     Despite Goldberg's rejection of the October 16 Digital Game and Cyanide and Bigben's recognition of his rejection—as evidenced by their follow-up request for grant approval after receiving Goldberg's rejection—Cyanide and Bigben charged forward, in secret, with a launch of an unapproved version of the Digital Game on Epic on December 5, 2019.  In so doing,

Cyanide and Bigben materially breached the License Agreement and engaged in a bad faith attempt to extend the terms of the License Agreement by "launching" the Digital Game prior to the Second Expiration Date of December 10, 2019.

44.     Upon information and belief, Epic Games Stores is an online digital video game storefront from which users around the world can pay for, access, and download digital video games.

45.     While still never admitting to Goldberg or Costikyan that they were distributing an unapproved version of the Digital Game, on December 10, Cyanide/Bigben wired $21,704 to Goldberg and Costikyan.  Goldberg, still unaware that an unapproved Digital Game had been launched on Epic, immediately responded that "no payment is due" and requested instructions for how to return the money.

46.     On December 11, 2019, Goldberg emailed Cyanide/Bigben stating that given that the parties had not reached an approvable version of the Digital Game by the Second Expiration Date, the License Agreement had terminated on December 10, 2019.  He then requested that Cyanide and Bigben send him and Costikyan materials pursuant to Sections 10 and 11 of the License Agreement.  No materials pursuant to Section 10 or 11 of the License Agreement were ever provided to Goldberg or Costikyan.

47.     Upon realizing that Cyanide/Bigben were distributing an unapproved version of the Digital Game on the Epic store, Goldberg and Costikyan sent a letter on December 16 to Cyanide and Bigben noting that their launch of an unapproved Digital Game constituted a flagrant and material breach of the License Agreement and an infringement on their copyright and trademark. Goldberg and Costikyan demanded that Bigben immediately pull the Digital Game from Epic, stating that only if and when this request is met "will [we] entertain having discussions around

how we can move forward." On December 20, December 30, and January 10, Goldberg and Costikyan renewed their demand that the unauthorized, infringing Digital Game be removed from Epic, and requested records pursuant to Section 7 of the License Agreement.

48. Cyanide and Bigben refused to cure their material breach and, despite multiple requests by Goldberg and Costikyan throughout December 2019 and January 2020 to remove the Digital Game from Epic, continued to distribute the unapproved, under-marketed Digital Game in violation of the License Agreement and in violation of Goldberg and Costikyan's copyright and trademark. Furthermore, at no point did Cyanide or Bigben provide Goldberg or Costikyan with records pursuant to Section 7 of the License Agreement.

49. On January 21, 2020, over a month after their initial request and 30 days after their notice of a material breach pursuant to Section 15 of the License Agreement, Goldberg and Costikyan sent Epic a takedown notice pursuant to the Digital Millennium Copyright Act ("DMCA takedown notice"), noting that the "distribution of *Paranoia: Happiness is Mandatory* via the Epic Games Store constitutes copyright and trademark infringement, as neither BigBen Interactive, Black Shamrock, nor Cyanide had authorization or approval from Messrs. Goldberg and Costikyan to launch the game." Three days later, Epic responded and "temporarily disabled access to the reported materials."

50. On January 30, 2020, Goldberg and Costikyan informed Cyanide and Bigben that the infringing Digital Game was no longer available on Epic and requested reports pursuant to Section 6 of the License Agreement. Goldberg and Costikyan have yet to receive any documents responsive to this request, or their previous request for documents pursuant to Sections 7, 10, or 11 of the License Agreement.

51.     Upon information and belief, in February 2020, Bigben Interactive S.A., a video game publisher and distributor, was consolidated into Nacon S.A., a video game publisher and distributor.

## FIRST CLAIM FOR RELIEF
### Breach Of Contract

52.     Counterclaim-Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 51 of the Counterclaims as is fully set forth herein.

53.     Counterclaim-Plaintiffs and Counterclaim-Defendant Cyanide entered into the binding and enforceable License Agreement on September 6, 2016, which was amended by Amendment No. 1, effective September 18, 2017, and Amendment No. 2, effective June 30, 2019. Upon information and belief, Counterclaim-Defendant Bigben assumed Counterclaim-Defendant Cyanide's obligations and liabilities under the License Agreement when it acquired Counterclaim-Defendant Cyanide in May 2018, and Counterclaim-Defendant Nacon assumed Counterclaim-Defendant Bigben's obligations and liabilities under the License Agreement when Bigben was consolidated under Nacon in February 2020.

54.     Counterclaim-Plaintiffs performed all of their material obligations required under the License Agreement.

55.     Counterclaim-Defendants breached the License Agreement by: (a) failing to provide an updated and accurate self-publishing plan that included "a reasonably detailed" description of Counterclaim-Defendants' plans for marketing and distribution; (b) launching an unapproved version of the Digital Game on Epic; (c) releasing multiple unapproved press releases announcing various release dates that could not be met given the unsuitable state of the Digital Game; and (d) refusing to provide the materials requested by Counterclaim-Plaintiffs pursuant to Sections 6, 7, 10 and 11 of the License Agreement.

56.      Counterclaim-Defendants' breaches of the License Agreement have harmed Counterclaim-Plaintiffs, including, but not limited to: lost revenue Counterclaim-Plaintiffs would have received if Counterclaim-Defendants had performed; lost revenue from the Royalty Payments that Counterclaim-Defendants failed to pay, including the millions of dollars of lost revenue owed to Counterclaim-Plaintiffs based on the exclusive deal with Epic; and harm to the *Paranoia* brand and IP, including resulting loss in revenue from future licensing activities related to a digital *Paranoia* game, in an amount to be proven at trial.

57.      Counterclaim-Defendants' breaches of the License Agreement were a substantial factor in causing Counterclaim-Plaintiffs harm.

**SECOND CLAIM FOR RELIEF**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

58.      Counterclaim-Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 57 of the Counterclaims as is fully set forth herein.

59.      Counterclaim-Plaintiffs and Counterclaim-Defendant Cyanide entered into the binding and enforceable License Agreement on September 6, 2016, which was amended by Amendment No. 1, effective September 18, 2017, and Amendment No. 2, effective June 30, 2019. Upon information and belief, Counterclaim-Defendant Bigben assumed Counterclaim-Defendant Cyanide's obligations and liabilities under the License Agreement when it acquired Counterclaim-Defendant Cyanide in May 2018, and Counterclaim-Defendant Nacon assumed Counterclaim-Defendant Bigben's obligations and liabilities under the License Agreement when Bigben was consolidated under Nacon in February 2020.

60.      Counterclaim-Plaintiffs performed all of their material obligations required under the License Agreement.

61.     Counterclaim-Defendants: (a) knowingly launched an unapproved version of the Digital Game on Epic; (b) represented that they had received approval through third parties who never held approval rights; and (c) launched an unapproved Digital Game to extend the terms of the License Agreement to the Third Expiration Date, and in doing so, Counterclaim-Defendants have prevented Counterclaim-Plaintiffs from receiving the benefits due under the License Agreement.

62.     By engaging in such conduct, Counterclaim-Defendants did not act fairly or in good faith.

63.     Counterclaim-Defendants' breaches of the implied duty of good faith and fair dealing have harmed Counterclaim-Plaintiffs, including, but not limited to: lost revenue Counterclaim-Plaintiffs would have received if Counterclaim-Defendants had performed; lost revenue from the Royalty Payments that Counterclaim-Defendants failed to pay, including the millions of dollars of lost revenue owed to Counterclaim-Plaintiffs based on the exclusive deal with Epic; and harm to the *Paranoia* brand and IP, including resulting loss in revenue from future licensing activities related to a digital *Paranoia* game, in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### Copyright Infringement

64.     Counterclaim-Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 63 of the Counterclaims as is fully set forth herein.

65.     Under Section 106 of the Copyright Act, a copyright owner has the exclusive right to reproduce, prepare derivative works based upon, distribute, publicly perform, and publicly display the copyrighted work, as well as the right to authorize others to engage in those activities.

66.     Counterclaim-Plaintiffs own the *Paranoia* Copyrights and *Paranoia* Digital Game Copyrights.

67.     Counterclaim-Defendants' launching and sale of an unapproved, unauthorized version of the Digital Game on Epic from December 5, 2019 to January 21, 2020 was a material breach of the License Agreement and infringed the exclusive rights in *Paranoia* afforded to Counterclaim-Plaintiffs under the Copyright Act.

68.     Upon information and belief, Counterclaim-Defendants received a direct financial and economic benefit from the exploitation of the *Paranoia* Copyrights and the *Paranoia* Digital Game Copyrights in the unauthorized sale of the Digital Game by, among other things, collecting royalty payments on sales of the Digital Game on Epic.

69.     The foregoing acts by Counterclaim-Defendants constitute intentional, willful, and direct infringement of Counterclaim-Plaintiffs' exclusive rights to the *Paranoia* Copyrights and the *Paranoia* Digital Game Copyrights and any derivative works based off the *Paranoia* Copyrights and/or *Paranoia* Digital Game Copyrights, and were committed by Counterclaim-Defendants with full knowledge of Counterclaim-Plaintiffs' copyright interest in *Paranoia* and infringement thereof.

70.     Each unauthorized derivative work and distribution to the public of Counterclaim-Plaintiffs' *Paranoia* Copyrights and/or *Paranoia* Digital Game Copyrights constitutes an individual act of infringement of Counterclaim-Plaintiffs' exclusive rights under the Copyright Act.

71.     Pursuant to Section 504(c) of the Copyright Act, as a direct and proximate result of Counterclaim-Defendants'    infringement    of    Counterclaim-Plaintiffs'    exclusive    rights, Counterclaim-Plaintiffs are entitled to recover statutory damages of up to $150,000 for the work infringed.  Alternatively, at Counterclaim-Plaintiffs' election, pursuant to Section 504(b), they are

entitled to their actual damages, as well as Counterclaim-Defendants' profits from the infringement, as will be proven at trial.

72.    Under 17 U.S.C. § 505, Counterclaim-Plaintiffs are entitled to recover their attorneys' fees and the full costs of this action for Counterclaim-Defendants' unjustified and willful violation of their exclusive rights under the Copyright Act.

73.    As a direct and proximate result of Counterclaim-Defendants' infringement of the *Paranoia* Copyrights and *Paranoia* Digital Game Copyrights, Counterclaim-Plaintiffs have also suffered irreparable harm for which there is no adequate remedy at law.

74.    Unless enjoined by this Court, Counterclaim-Defendants' wrongful acts will continue and Counterclaim-Plaintiffs will continue to suffer irreparable harm for which they have no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
**Infringement of Federally Registered Trademark Under Federal Lanham Act, 15 U.S.C. § 1114**

75.    Counterclaim-Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 74 of the Counterclaims as is fully set forth herein.

76.    Counterclaim-Plaintiffs are the owners of all right, title, and interest in the Paranoia Mark.

77.    Counterclaim-Defendants' unauthorized marketing, advertisement, promotion, and sale of goods using the Paranoia Mark or reproductions, copies, or colorable variations thereof has caused or was likely to cause confusion, mistake or deception in that actual and potential customers likely erroneously believed that the Digital Game available for sale at the Epic online store from December 5, 2019 to January 21, 2020 was provided by, sponsored by, approved by, licensed by, affiliated with, or emanating from the *Paranoia* brand and the goodwill associated therewith.

78.     By making unauthorized use in interstate commerce of trademarks that infringe Counterclaim-Plaintiffs' Paranoia Mark, Counterclaim-Defendants' activities as alleged herein constitute trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

79.     Upon information and belief, Counterclaim-Defendants' conduct was malicious, intentional, and willful.

80.     Pursuant to 15 U.S.C. § 1117 of the Lanham Act, as a direct and proximate result of Counterclaim-Defendants' infringement of the Paranoia Mark, Counterclaim-Plaintiffs are entitled to damages, including treble damages, as well as Counterclaim-Defendants' profits and attorneys' fees, as will be proven at trial.

81.     As a direct and proximate result of Counterclaim-Defendants' infringement of the Paranoia Mark, Counterclaim-Plaintiffs have also suffered irreparable harm for which there is no adequate remedy at law.

82.     Unless enjoined by this Court, Counterclaim-Defendants' wrongful acts will continue and Counterclaim-Plaintiffs will continue to suffer irreparable harm for which they have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### False Designation of Origin, Unfair Competition and Trademark Infringement Under Federal Lanham Act, 15 U.S.C. § 1125(A)

83.     Counterclaim-Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 82 of the Counterclaims as is fully set forth herein.

84.     Counterclaim-Plaintiffs are the owners of all right, title, and interest in the Paranoia Mark.

85.     Counterclaim-Defendants unauthorized marketing, advertisement, promotion, and sale of goods using the Paranoia Mark or reproductions, copies, or colorable variations thereof has caused or was likely to cause confusion, mistake, or deception in that actual and potential

customers likely erroneously believed that the Digital Game available for sale at the Epic online store from December 5, 2019 to January 21, 2020 was provided by, sponsored by, approved by, licensed by, affiliated with, or emanating from the *Paranoia* brand and the goodwill associated therewith.

86.     By making unauthorized use in interstate commerce of trademarks that infringe Counterclaim-Plaintiffs' Paranoia Mark, Counterclaim-Defendants' activities as alleged herein constitute unfair competition, false designation of origin, trademark infringement, and false description and representation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

87.     Upon information and belief, Counterclaim-Defendants' conduct was malicious, intentional, and willful.

88.     Pursuant to 15 U.S.C. § 1117 of the Lanham Act, as a direct and proximate result of Counterclaim-Defendants' infringement of the Paranoia Mark, Counterclaim-Plaintiffs are entitled to damages, including treble damages, as well as Counterclaim-Defendants' profits and attorneys' fees, as will be proven at trial.

89.     As a direct and proximate result of Counterclaim-Defendants' infringement of the Paranoia Mark, Counterclaim-Plaintiffs have also suffered irreparable harm for which there is no adequate remedy at law.

90.     Unless enjoined by this Court, Counterclaim-Defendants' wrongful acts will continue and Counterclaim-Plaintiffs will continue to suffer irreparable harm for which they have no adequate remedy at law.

### SIXTH CLAIM FOR RELIEF
**Deceptive Acts and Practices Under Section 349 of New York General Business Law**

  
91.     Counterclaim-Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 90 of the Counterclaims as is fully set forth herein.

92.     Counterclaim-Plaintiffs are the owners of all right, title, and interest in the Paranoia Mark, including all common law rights in the Paranoia Mark.

93.     Upon information and belief, Counterclaim-Defendants' deceptive acts and practices, as set forth above, are consumer-oriented in part because Counterclaim-Defendants published an unapproved, infringing Digital Game in association with Counterclaim-Plaintiffs' Paranoia Mark on the Epic store, a consumer-facing website. Counterclaim-Defendants have engaged in consumer-oriented conduct that has resulted in injury to New York consumers.

94.     Counterclaim-Defendants' deceptive acts and practices, as described herein, are materially misleading.  Upon information and belief, these acts and practices have deceived or have a tendency to deceive a material segment of the public to whom Counterclaim-Defendants have directed their marketing activities and Counterclaim-Plaintiffs have been injured thereby.

95.     Counterclaim-Defendants' deceptive acts and practices affect the public interest in New York because, upon information and belief, consumers located in New York have suffered injury by purchasing Counterclaim-Defendants' products as a result of Counterclaim-Defendants' deceptive acts and practices.

96.     Upon information and belief, by the acts described herein, Counterclaim-Defendants have willfully engaged in deceptive acts or practices in the conduct of business and furnishing services in violation of Section 349 of the New York General Business Law.

97.     Upon information and belief, Counterclaim-Defendants' conduct is malicious, intentional, and willful and is being committed with predatory interest.

98.     By reason of Counterclaim-Defendants' unlawful acts and practices, Counterclaim-Plaintiffs have suffered, are suffering, and will continue to suffer damage to their business, reputation, and goodwill, and the loss of sales and profits Counterclaim-Plaintiffs would have made but for Counterclaim-Defendants' acts, in an amount to be determined at trial.

99.     Additionally, Counterclaim-Defendants have received revenue in the form of sales caused by their deceptive acts and practices, in an amount to be determined at trial.

100.     As a direct and proximate result of Counterclaim-Defendants' wrongful acts, Counterclaim-Plaintiffs have also suffered irreparable harm for which there is no adequate remedy at law.

101.     Unless enjoined by this Court, Counterclaim-Defendants' wrongful acts will continue and Counterclaim-Plaintiffs' will continue to suffer irreparable harm for which they have no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF
### Likelihood of Injury to Business Reputation Under Section 360-l of New York General Business Law

102.     Counterclaim-Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 101 of the Counterclaims as is fully set forth herein.

103.     Counterclaim-Plaintiffs are the owners of all right, title, and interest in the Paranoia Mark, including all common law rights in the Paranoia Mark.

104.     Upon information and belief, Counterclaim-Defendants' unlawful use of the Paranoia Mark in the sale of the unapproved Digital Game is likely to cause consumers to purchase the Digital Game with the erroneous belief that Counterclaim-Plaintiffs were associated with, sponsored by, affiliated with, or approved the Digital Game, or that Counterclaim-Plaintiffs are the source of the Digital Game that was launched by Counterclaim-Defendants in breach of the License Agreement.

105.    The unapproved and under-marketed Digital Game is likely to cause consumers to believe that Counterclaim-Plaintiffs have changed their quality control standards, causing harm to the *Paranoia* IP, brand, and reputation.

106.    By the acts described herein, Counterclaim-Defendants have caused or are likely to cause a likelihood of harm to Counterclaim-Plaintiffs' business reputation in violation of Section 360-l of New York General Business Law.

107.    Upon information and belief, Counterclaim-Defendants' conduct is malicious, intentional, and willful, and is being committed with predatory intent.

108.    As a direct and proximate result of Counterclaim-Defendants' wrongful acts, Counterclaim-Plaintiffs have suffered irreparable harm for which they have no adequate remedy at law.

109.    Unless enjoined by this Court, Counterclaim-Defendants' wrongful acts will continue and Counterclaim-Plaintiffs will continue to suffer irreparable harm for which they have no adequate remedy at law.

### SEVENTH CLAIM FOR RELIEF
**Trademark Infringement Under Common Law**

110.    Counterclaim-Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 109 of the Counterclaims as is fully set forth herein.

111.    Counterclaim-Plaintiffs are the owners of all right, title, and interest in the Paranoia Mark, including all common law rights in the Paranoia Mark.

112.    Counterclaim-Defendants advertised, promoted, and sold derivative works, including a digital video game, in association with Counterclaim-Plaintiffs' Paranoia Mark or colorable imitations thereof.   Such unauthorized use by Counterclaim-Defendants of Counterclaim-Plaintiffs' Marks or colorable imitations thereof constitutes trademark infringement

and is likely to cause confusion and mistake in the minds of the trade and purchasing public as to the authorization of the Digital Game, and to cause purchasers to mistakenly believe the Digital Game was authorized by Counterclaim-Plaintiffs.

113.    Upon information and belief, Counterclaim-Defendants have misappropriated Counterclaim-Plaintiffs' Paranoia Marks, causing confusion, mistake, and deception as to the source and authorization of the Digital Game.  Counterclaim-Defendants market the Digital Game as that of and authorized by Counterclaim-Plaintiffs, improperly trading upon Counterclaim-Plaintiffs' goodwill and Counterclaim-Plaintiffs' valuable rights in and to its Paranoia Mark.

114.    Upon information and belief, Counterclaim-Defendants committed the acts described herein willfully, in bad faith, and in conscious disregard of Counterclaim-Plaintiffs' rights and Counterclaim-Plaintiffs are therefore entitled to  actual, exemplary, and punitive damages pursuant to the common law of the State of New York in an amount sufficient to punish, deter, and make an example of Counterclaim-Defendants.

115.    By the acts described herein, Counterclaim-Defendants have engaged in trademark infringement in violation of the common law of the State of New York.

116.    Upon information and belief, Counterclaim-Defendants' conduct is malicious, intentional, and willful.

117.    As a direct and proximate result of Counterclaim-Defendants' wrongful acts, Counterclaim-Plaintiffs have also suffered irreparable harm for which they have no adequate remedy at law.

118.    Unless enjoined by this Court, Counterclaim-Defendants' wrongful acts will continue and Counterclaim-Plaintiffs will continue to suffer irreparable harm for which they have no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF
### Declaratory Relief

119.    Counterclaim-Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 118 of the Counterclaims as is fully set forth herein.

120.    An actual controversy has arisen and now exists between Counterclaim-Plaintiffs and Counterclaim-Defendants regarding whether: (a) the License Agreement terminated on December 10, 2019; (b) Counterclaim-Defendants' failures under the License Agreement discharged Counterclaim-Plaintiffs' performance under the License Agreement; and (c) Counterclaim-Defendants are authorized to withhold the Royalty Payments under the License Agreement.

121.    Counterclaim-Plaintiffs contend that: (a) the License Agreement terminated on December 10, 2019; (b) Counterclaim-Plaintiffs' performance under the License Agreement has been discharged by Counterclaim-Defendants' failures under the License Agreement; and (c) Counterclaim-Defendants have no authority to withhold the Royalty Payments pursuant to the License Agreement.

122.    Upon information and belief, Counterclaim-Defendants dispute the above for reasons inexplicable to Counterclaim-Plaintiffs.

123.    Counterclaim-Plaintiffs desire a judicial determination of the rights and duties between the parties, and a judicial declaration that: (a) the License Agreement terminated on December 10, 2019; (b) Counterclaim-Plaintiffs' performance under the License Agreement has been excused; and (c) Counterclaim-Defendants are not authorized to withhold Royalty Payments pursuant to the License Agreement.

124.    A judicial declaration of Counterclaim-Plaintiffs' and Counterclaim-Defendants' respective rights and obligations is necessary and appropriate at this time under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimant-Plaintiffs respectfully request that this Court enter judgment in favor of Counterclaim-Plaintiffs and against Counterclaim-Defendants as follows:

(a)     Finding that Counterclaim-Defendants have: (i) breached the License Agreement; (ii) breached their duty of good faith and fair dealing implicit in the License Agreement; (iii) intentionally, willfully, and directly infringed Counterclaim-Plaintiffs' *Paranoia* Copyrights and *Paranoia* Digital Game Copyrights, in violation of the Copyright Act; and (iv) violated Sections 32 and 43(a) of the Lanham Act (15 U.S.C. §§ 1114 and 1125(a)), Sections 349 and 360-l of the New York General Business Law, and New York common law;

(b)     A judicial declaration that: (i) the License Agreement terminated on December 10, 2019; (ii) Counterclaim-Plaintiffs' performance under the License Agreement has been discharged; and (iii) Counterclaim-Defendants have no authority to withhold the Royalty Payments pursuant to the License Agreement;

(c)     Awarding damages for breach of the License Agreement and breach of the implied duty of good faith and fair dealing in an amount to be determined at trial, including but not limited to, lost revenue Counterclaim-Plaintiffs would have received if Counterclaim-Defendants had performed, lost revenue from Royalty Payments Counterclaim-Defendants failed to pay, losses sustained by Counterclaim-Plaintiffs due to Counterclaim-Defendants' harm to the *Paranoia* brand and IP, and profits of which Counterclaim-Plaintiffs have been deprived;

(d)     For an award of statutory damages in the amount of $150,000 for willful copyright infringement or, at Counterclaim-Plaintiffs' election, actual damages and profits as permitted under the Copyright Act, in an amount to be determined at trial;

(e)     For an award of damages, including treble damages, as well as profits and attorneys' fees, to be determined at trial, pursuant to Sections 32 and 43(a) of the Lanham Act (15 U.S.C. §§ 1114 and 1125(a)), and damages in an amount to be determined at trial, including but not limited to, loss of sales and profits pursuant to Section 349 of the New York General Business Law and actual, exemplary, and punitive damages pursuant to New York common law;

(f)     A permanent injunction prohibiting Counterclaim-Defendants Cyanide, Bigben, Nacon, or any other person affiliated with, employed by, or on behalf of Counterclaim-Defendants from: (i) advertising, marketing,

distributing or selling any version of the Digital Game; and (ii) acts or threatened continued acts of copyright infringement or trademark infringement or false designation of origin;

(g)     Awarding Counterclaim-Plaintiffs their full costs, prejudgment and post-judgment interest according to law, and attorneys' fees, pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117;

(h)     Granting such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Defendants and Counterclaim-Plaintiffs Goldberg and Costikyan hereby demand a trial by jury on all issues triable by a jury for the above-identified counterclaims.


Dated:  New York, New York
        May 5, 2022

FRANKFURT KURNIT KLEIN + SELZ PC


By:   */s/ Craig B. Whitney*
     Craig B. Whitney
     Ashley K. Alger
     28 Liberty Street
     New York, New York 10005
     cwhitney@fkks.com
     aalger@fkks.com

     *Attorneys for Defendants Eric Goldberg and Greg Costikyan*